UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | | |
|---|---|---|
| DRILL CUTTINGS DISPOSAL CO., L.L.C. | * | CIVIL ACTION NO. 08-1837 |
| VS. | * | MAGISTRATE JUDGE HILL |
| KEM-TRON TECHNOLOGIES, INC. | * | BY CONSENT OF THE PARTIES |

**REASONS FOR JUDGMENT**

On July 27-28, 2010, the Court conducted a bench trial of this matter. Appearing for the parties were Alan K. Breaud, representing plaintiff, Drill Cuttings Disposal Co., L.L.C. ("DCDC"), and John T. Nesser, IV, representing defendant, Kem-Tron Technologies, Inc. ("Kem-Tron"). The parties filed post-trial briefs, after which the Court took the matter under advisement. For the following reasons, the Court will award judgment in favor of plaintiff, DCDC.

The following findings of fact and conclusions of law are made pursuant to Fed. R. Civ. P. 52. To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

*Findings of Fact*

1. DCDC provides equipment, labor, parts, supplies, and rentals for the disposal of drilling cuttings, which are materials removed from the borehole while drilling wells for the production of petroleum.

2. Kem-Tron specializes in the design, manufacture, and supply of solids separation and polymer application equipment for petroleum production.

3. In July, 2008, Kem-Tron's Vice-President of Technical Services, David Reardon ("Reardon"), contacted DCDC's President, Jeffrey Reddoch, Jr. ("Reddoch"), regarding the rental of a cuttings dryer for use on two wells in the Haynesville Shale area in North Louisiana.

4. By letter dated July 2, 2008, DCDC, through Reddoch, presented a bid to Kem-Tron for the rental of a cuttings dryer in connection with a job being performed by Kem-Tron's customer, EnCana Oil & Gas (USA), Inc. ("EnCana"), in the Haynesville Shale area.

5. On July 3, 2008, Reardon signed and accepted the bid on behalf of Kem-Tron (the "letter agreement"), and returned the executed letter agreement to DCDC by facsimile.

6. Pursuant to the letter agreement, Kem-Tron agreed to rent the dryer from DCDC at the standard price of $1,500.00, which DCDC discounted to $800.00 per day based on a 90 day or longer rental period.

7. In turn, Kem-Tron billed EnCana $1,150.00 per day for the dryer rental.

8. DCDC also supplied personnel to install the equipment and perform monthly inspections at the rate of $550.00 per day.

9. Pursuant to the letter agreement, the operator was responsible for "[r]ig up/down, welding, electricians, assembly, connecting piping, electrical wire, shipping, flights, taxis, taxes, trucking/transport, stands, catering/subsistence and housing."

10. The "Terms and Conditions" provisions of the letter agreement provided that "[e]quipment and rental personnel charges are shop to shop." The Court finds that the term "shop to shop" meant that DCDC was to charge, and Kem-Tron was to pay, for the leased equipment from the day that equipment/personnel left DCDC's shop until the day the equipment was returned to DCDC.

11. The letter agreement provided that "[e]quipment/personnel/supplies/parts, equipment/personnel transport not specifically quoted will be supplied at standard list price or cost plus 15%."

12. Kem-Tron did not have some of the equipment required for operation of the dryer. Accordingly, DCDC provided these additional items, which included a generator, vacuum, auger runs, and auger drives.

13. The letter agreement provided that repair charges "are billed at cost to repair plus 15%." . . . "Screens are $2600.00 each with return of screen body. A replacement screen will be charged at end of job."

14. DCDC offered Kem-Tron a five percent (5%) discount for prompt payment of invoices.

15. The letter agreement provided that after the unit was operating to DCDC and Kem-Tron's satisfaction, Kem-Tron's personnel could take over operation, but Kem-Tron was responsible for all normal maintenance and any damages/loss.

16. DCDC believed that Kem-Tron was a bad credit risk.

17. Reddoch testified, and the Court accepts that testimony as true, that from the perspective of DCDC, it took from four to six months of timely payments to establish acceptable credit with DCDC.

18. Under the "Payment terms" section of the letter agreement, DCDC billed Kem-Tron at the beginning of each month or ship date, one month at a time, net 30 days. Late fees applied for all late payments received after 30 days at 5% of the total invoice per month. If collection was required, a 25% attorney fee applied.

19. The letter agreement provided that any changes to prices or instructions "must be agreed in writing."

20. The dryer was shipped to North Louisiana for work on the Nabors F-20 drilling rig ("Nabors rig") on July 14, 2008, and rigged up on July 15, 2008.

21. By invoice number KTN-07-08-1 dated July 21, 2008, DCDC billed Kem-Tron for $24,970.13, less the 5% discount for prompt payment, for a total of $23,721.62. This invoice was for personnel and related costs on the Nabors rig job.

22. By invoice number KTN-07-08-2 dated July 21, 2008, DCDC billed Kem-Tron for $39,960.00, less the 5% discount for prompt payment, for a total of $37,962.00. This invoice related to equipment rental for 18 days on the Nabors rig job.

23. By invoice number KTN-07-08-3 dated July 21, 2008, DCDC billed Kem-Tron for $71,145.00, less the 5% discount for prompt payment, for a total of $67,587.75. This invoice related to equipment rental for 31 days on the Nabors rig job.

24. On July 23, 2008, Reddoch met with Reardon at his office in Houston, Texas, where Reardon signed the first three invoices, thus evidencing acceptance of the invoices.

25. In an e-mail from Reddoch to Robert McDonald ("McDonald") of Kem-Tron dated July 25, 2008, Reddoch stated that "per the bid, we pre-bill for rental equipment, however, this will change once credit is established. Also, if there are any days you can't charge for, like rig moves, we will credit on future invoices." A copy of this e-mail was sent to Reardon.

26. Kem-Tron did not respond to this email.

27. On August 11, 2008, Kem-Tron paid the amount of $129,271.37 to DCDC by check number 20855. This check included payment *in full* for invoices KTN-07-1 ($23,721.62), KTN-07-2 ($37,962.00), and KTN-07-3 ($67,587.75).

28. In August, 2008, Kem-Tron requested another dryer from DCDC for the Precision #630 drilling rig ("Precision rig") in the Haynesville Shell area.

29. By invoice number KTN-07-08-4 dated August 6, 2008, DCDC billed Kem-Tron for $16,694.44 for personnel and related costs as well as equipment costs in connection with the Precision rig.

30. By invoice number KTN-07-08-5 dated August 6, 2008, DCDC billed Kem-Tron for $9,990.00 for equipment rental for the Precision rig.

31. By invoice number KTN-07-08-6 dated August 15, 2008, DCDC billed Kem-Tron for $34,410.00 for equipment rental for the Precision rig.

32. By invoice number KTN-07-08-7 dated September 15, 2008, DCDC billed Kem-Tron for $52,647.00 for equipment rental for the Precision rig.

33. By invoice number KTN-07-08-8 dated September 15, 2008, DCDC billed Kem-Tron for $62,551.50 for equipment rental for the Nabors rig.

34. By invoice number 146947 dated September 17, 2008, Southland Electric Rental ("Southland") billed Kem-Tron $3,700.00 for equipment provided to Kem-Tron by Southland from August 1-30, 2008, to wit, the lease of an electrical distribution panel.

35. Prior to authorizing the issuance of a check to Southland to pay this invoice, Kem-Tron's assistant controller, Ranga Kandoor ("Kandoor"), called Southland and asked for a reduction on the invoiced amount based on the number of days Kem-Tron actually used Southland's equipment.

36. Southland agreed to reduce the amount owed on the invoice to $2,400.00 based on 20 days of actual use instead of 30 days as per the invoice.

37. On November 19, 2008, Kem-Tron issued a check in the amount of $2,400.00 to Southland.

38. In August, 2008, Kem-Tron re-negotiated with EnCana the rental of DCDC's cuttings dryer, reducing EnCana's daily rate from $1,150 to $575.00 per day.

39. By invoice number KTN-07-08-9, DCDC billed Kem-Tron for $2,787.00 for personnel costs associated with the Nabors rig.

40. By invoice number KTN-07-08-10, (dated September 15, 2008), DCDC billed Kem-Tron for $1,600.65 for the Precision rig.

41. By invoice number KTN-07-08-11 dated September 22, 2008, DCDC billed Kem-Tron $39,240.00 for equipment rental for the Precision rig.

42. By invoice number KTN-07-08-10 (repeated number) dated October 14, 2008, DCDC billed Kem-tron for $5,661.06 for personnel costs and equipment rental for the Nabors Rig.

43. By invoice number KTN-07-08-12 dated October 14, 2008, DCDC billed Kem-Tron $18,648.75 for personnel costs and equipment rental for the Precision rig.

44. DCDC did not charge sales taxes on invoices KTN-07-08-1 through KTN-07-08-6 and KTN 07-08-9.

45. DCDC charged sales taxes on invoice numbers KTN-07-08-7, KTN-07-08-8, KTN-07-08-10 (on both the original and mis-numbered invoice), KTN-07-08-11, KTN-07-08-13, and KTN-07-08-14. DCDC charged $48.15 in sales tax under invoice number KTN-08-12.

46. On October 24, 2008, Kem-Tron made a wire transfer payment of $81,119.55 to DCDC. This is the only amount paid on these invoices.

47. DCDC assessed finance charges against Kem-Tron by invoice number FC 1 dated September 15, 2008, in the amount of $495.21; FC 4 dated October 1, 2008, in the amount of $1,606.87; FC 6 dated October 15, 2008, in the amount of $1,406.01; FC 7 dated October 24, 2008, in the amount of $1,835.45, and FC 8 dated October 24, 20008, in the amount of $966.65.

48. Kem-Tron stopped renting equipment from DCDC on September 30, 2008.

49. On October 1, 2010, DCDC began renting equipment for EnCana to Steve Kent Trucking.

50. By invoice number KTN-07-08-13 dated November 25, 2008, DCDC billed Kem-Tron $32,686.56 for damages to the cuttings dryer on the Precision rig. This included a charge of $2,800.00 for replacement of the dryer screen.

51. It is unknown whether the damages to the dryer occurred while it was being rented to Kem-Tron, Steve Kent Trucking or EnCana.

52. By invoice number KTN-07-08-14 dated October 31, 2008, DCDC billed Kem-Tron $9,882.02 for two dryer screens and oil filters on the Nabors rig.

53. By invoice number ENC-07-08-3 dated November 18, 2008, DCDC billed EnCana $2,800.00 for a dryer screen on the Nabors rig.

54. By invoice number ENC-07-08-1 dated November 18, 2008, DCDC billed EnCana $2,800.00 for a dryer screen on the Precision rig.

55. On October 31, 2010, Attorney Steven C. Lanza of the Onebane Law Firm sent a demand letter on behalf of DCDC to Kem-Tron demanding payment of the balance

of $169,421.04. This amount included the amounts remaining due under invoice numbers KTN-07-08-4, KTN-07-08-5, KTN-07-08-6, FC 1, KTN-07-08-7, KTN-07-08-8, KTN-07-08-9, KTN-07-08-10, KTN-07-08-11, FC 4, KTN-07-08-10, KTN-07-08-12, FC 6, FC 7 and FC 8, less the wired funds of $81,119.55 received by DCDC on October 24, 2008.

56. Reading the July 25, 2008 e-mail from Reddoch to McDonald, as a whole, DCDC was willing to credit future invoices for any days which Kem-Tron could not charge its customer for, like rig moves, "once credit is established."

57. Kem-Tron never established credit with DCDC.

58. Reardon's approval of the first three invoices and Kem-Tron's payment of these invoices in full clearly confirms Kem-Tron's understanding that it owed for rental of the equipment on a shop-to-shop basis, and not just for the days Kem-Tron actually used the equipment.

59. Kem-Tron called Southland and asked for a reduction of the rental based on the number of days Kem-Tron actually used Southland's equipment on the EnCana job, which was agreed to by Southland.

60. Kem-Tron never contacted DCDC to ask for a similar modification; Kem-Tron had no such agreement with DCDC.

61. The letter agreement between Kem-Tron and DCDC was never modified in writing. DCDC never verbally agreed to modify the letter agreement.

62. Kem-Tron never made any contact with DCDC in which it (Kem-Tron) indicated that it believed that the "shop to shop" payment term in the letter agreement had been modified.

63. The Court finds that DCDC did not prove that the damages to the dryer were caused by Kem-Tron, as it is unknown whether the damages to the dryer occurred while it was being rented to Kem-Tron, Steve Kent Trucking or EnCana.

64. There was no evidence that proved whether the damages to the DCDC dryer were due to misuse or normal wear and tear.

65. The Court finds as fact that the dryer on the Precision rig was damaged while it was leased to EnCana, and that EnCana paid for the dryer damages.

66. Thus, DCDC can only recover payment for one of the dryer screens.

67. While the Blanket Certificate of Exemption from sales tax for Steve Kent Investments, Inc. was introduced as an exhibit, Kem-Tron produced no evidence showing that it had filed the necessary documents with the State of Louisiana in order to be exempt from sales tax.

68. The letter agreement provided that if collection was required, a 25% attorney fee would apply. DCDC had to retain counsel and institute collection efforts against Kem-Tron to collect the amounts due under the letter agreement.

69. DCDC is a Louisiana Limited Liability Company, domiciled in Lafayette Parish Louisiana. Kem-Tron is a Texas Corporation doing business in Louisiana.

*Conclusions of Law*

1. This Court has diversity jurisdiction in this case pursuant to 28 U.S.C. § 1332. Accordingly, Louisiana law applies. *Wampold v. E. Eric Guirard,* 442 F.3d 269 (5th Cir. 2006).

2. A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. LA CIV. CODE art. 1906.

3. Contracts have the effect of law for the parties and may be dissolved only through the consent of the parties or on grounds provided by law. Contracts must be performed in good faith. LA. CIV. CODE art. 1983.

4. Interpretation of a contract is the determination of the common intent of the parties. LA. CIV. CODE art. 2045.

5. To determine the parties' intent, courts must first look to the words and provisions of the contract. When they are clear and explicit, no further interpretation may be made in search of the parties' intent. *Amend v. McCabe*, 95-0316 (La. 12/01/95); 664 So.2d 1183, 1187.

6. The words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter. LA. CIV. CODE art. 2047.

7. Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract. LA. CIV. CODE art. 2048.

8. A contract provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective. LA. CIVIL CODE art. 2049.

9. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. LA. CIV. CODE Art. 2050.

10. A contract is binding between two parties when an offer is made by one of the parties and acceptance is made by the other party, thereby establishing a concurrence in understanding the terms. *Shreveport Elec. Co., Inc. v. Oasis Pool Service, Inc.*, 38,776 (La. App. 2 Cir. 9/29/04); 889 So.2d 274, 279 (*citing Tyler v. Haynes*, 99-1921 (La. App. 3 Cir. 05/03/00); 760 So.2d 559).

11. The letter agreement between DCDC and Kem-Tron is a legally binding contract under Louisiana law.

12. Under the terms of letter agreement, Kem-Tron was bound to pay for rental of the DCDC equipment for each day, from the day the equipment left DCDC's shop until the day it was returned to DCDC.

13. DCDC and Kem-Tron never agreed to modify the letter agreement.

14. Under the letter agreement, Kem-Tron was obligated to pay sales tax. Since the court found no evidence that the necessary documents were filed with the State of Louisiana to exempt Kem-Tron form paying sales tax, the Court finds that Kem-Tron was obligated to pay sales tax according to law.

15. Under the letter agreement, late fees applied for all late payments received after 30 days at 5% of the total invoice per month. Thus, Kem-Tron is liable for the late fee on each invoice from the date it became 30 days past due until paid.

16. The final wire transfer payment of $81,119.55 dated October 24, 2008, will be applied to oldest invoices first, to penalties then principal. There being no provision to the contrary in the letter agreement, the finance charges are not compounded.

17. Accordingly, the Court finds that DCDC is entitled to judgment as follows:

| | |
|---|---|
| KTN-07-08-4 | $ 16,694.44 |
| KTN-08-07-5 | $ 9,990.00 |
| KTN-08-07-6 | $ 34,410.00 |
| KTN-08-07-7 | $ 52,647.00 |
| KTN-08-07-8 | $ 62,551.50 |
| KTN-08-07-9 | $ 2,787.00 |
| KTN-08-07-10 | $ 1,600.65 |
| KTN-08-07-11 | $ 39,240.00 |
| KTN-08-07-10 (repeat number) | $ 5,661.06 |
| KTN-08-07-12 | $ 18,648.75 |
| KTN-08-07-13 | $ 32,686.56 |
| KTN-08-17-14 (less costs of 2 dryers) | $ 3,778.03[1] |
| TOTAL | $280,694.99 |

18. To this amount must be added finance charges as set out in the letter agreement of 5% per month (not compounded), less the $ 81,119.55 payment made by Kem-Tron, applied as set out above.

---

[1] This amount was calculated by deducting the cost of the two dryers ($5,600.00), for a pre-tax total of $3,446.08, plus 9% sales tax on that amount.

19. Louisiana law provides that "[i]f the parties, by written contract, have expressly agreed that the obligor shall also be liable for the obligee's attorney fees in a fixed or determinable amount, the obligee is entitled to that amount as well." LA. CIV. CODE art. 2000.

20. Thus, Kem-Tron owes DCDC attorney's fees. Although the parties are free to stipulate the amount of attorney fees if collection is required, (here the parties agreed to attorney's fees in the amount of 25%), the Court may inquire into the reasonableness of the fee. *Fourchon Docks, Inc. v. Milchem Inc.*, 849 F.2d 1561 (5th Cir. 1988) *citing Central Progressive Bank v. Bradley*, 502 So. 2d 1017 (La. 1987).

21. **IT IS HEREBY ORDERED THAT** DCDC's counsel file an affidavit of attorney's fees into the record along with an itemized bill of fees and expenses **within ten (10) days**. This affidavit must contain a description of the work done, a breakdown of time spent performing this work and the customary hourly rate charged clients for this type of litigation.

22. Since DCDC is the prevailing party, costs of this case will be assessed against Kem-Tron.

22. The parties are directed to file a proposed judgment for the Court's consideration, in accord with these reasons, approved by both counsel as to form, within ten (10) days.

THUS DONE AND SIGNED October 14, 2010, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE